UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| RYAN ROBB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.   18-cv-02307 |
| ) | |
| BOARD OF TRUSTEES OF COMMUNITY COLLEGE ) | |
| DISTRICT NO. 505 (PARKLAND COLLEGE) ) | |
| COUNTIES OF CHAMPAIGN, COLES, DEWITT, ) | |
| DOUGLAS, EDGAR, FORD, IROQUOIS, ) | |
| LIVINGSTON, MCLEAN, MOULTRIE, PIATT, ) | |
| VERMILION AND STATE OF ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S FIRST MOTION IN LIMINE**
**(Toni Burkhalter nka Toni Gist)**

NOW COMES the Defendant, BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 505 (PARKLAND COLLEGE) COUNTIES OF CHAMPAIGN, COLES, DEWITT, DOUGLAS, EDGAR, FORD, IROQUOIS, LIVINGSTON, MCLEAN, MOULTRIE, PIATT, VERMILION AND STATE OF ILLINOIS ("Parkland College,") by its attorneys Meyer Capel, A Professional Corporation, and for its first Motion in Limine requests that this Court limit Ms. Gist's testimony to purely lay testimony which already been disclosed and prohibit the Plaintiff from eliciting any expert testimony from Toni Gist as she has not be disclosed as an expert witness or properly qualified to render an expert opinion. Defendant further states:

1. Ms. Gist's testimony should be limited to her work as an employee of Parkland College, to the extent it has any relevance to the Plaintiff's claim.

2. Ms. Gist should not be allowed to testify to as to her interpretation of the Plaintiff's qualifications to teach at Parkland College.

1

3. Ms. Gist left her employment at Parkland College in August 2017 (See attached **Exhibit 1**, Declaration of Toni Burkhalter, Opposition to Motion for Summary Judgment).

4. The Higher Learning Commission, one of the bodies regulating community colleges, including Parkland College, issued new guidance to community colleges regarding required minimum faculty qualifications to be implemented by community colleges by September 1, 2017 (see attached **Exhibit 2**).

5. After Ms. Gist left Parkland College she went to the University of Illinois to teach a course titled Food Service and Human Nutrition 120, Contemporary Nutrition and to act as an advisor to students in the Food Science and Human Nutrition Department.

6. It is anticipated Plaintiff will attempt to offer Gist's testimony as to her review of Plaintiff's college transcripts and her interpretation of Plaintiff's qualifications to teach Biology 120 at Parkland College.

7. Reviewing transcripts and offering opinions as to professorial qualifications were never a part of Ms. Gist's job at Parkland College.

8. Ms. Gist was first identified as a witness by the Plaintiff in his Answers to Interrogatory No. 6, which states: "Toni Burkhalter – Taught biology courses for multiple years when Plaintiff was not allowed to teach them despite having the same or a substantially similar degree to Plaintiff; has knowledge of Defendant's process for assigning courses."

9. At no time is Ms. Gist identified by the Plaintiff as being an individual responsible for reviewing qualifications of Parkland professors for teaching and likely to provide such evidence in this matter.

10. Such opinion testimony would be that of an expert witness. Expert witnesses were to be disclosed by November 1, 2022. The only expert witness disclosed by the Plaintiff is Stephanie Rizzardi.

11. Even if properly disclosed, Ms. Gist could not qualify as an expert to render such opinions in that Ms. Gist has no experience in reviewing college transcripts to ensure community college compliance with the Higher Learning Commission Requirements.

12. Ms. Gist's experience as a professor and student advisor at the University of Illinois is not comparable and in no way qualifies her as an expert in interpreting and applying the HLC requirements at issue in this matter.

WHEREFORE, the Defendant, BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 505 (PARKLAND COLLEGE) COUNTIES OF CHAMPAIGN, COLES, DEWITT, DOUGLAS, EDGAR, FORD, IROQUOIS, LIVINGSTON, MCLEAN, MOULTRIE, PIATT, VERMILION AND STATE OF ILLINOIS, moves the Court to enter an order excluding the evidence or testimony outlined above, and prohibiting any questions, arguments or commentary during any stage of the trial relating in any way to the aforesaid matters.

GRANTED:_____       DENIED: _____

Respectfully submitted,

**BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 505 (PARKLAND COLLEGE) COUNTIES OF CHAMPAIGN, COLES, DEWITT, DOUGLAS, EDGAR, FORD, IROQUOIS, LIVINGSTON, MCLEAN, MOULTRIE, PIATT, VERMILION AND STATE OF ILLINOIS**, Defendant,

By: Meyer Capel, A Professional Corporation

By: **/s/ Lorna K. Geiler**
Lorna K. Geiler, Bar#6192940
Attorney for the Defendant
Meyer Capel, A Professional Corporation
306 W. Church St.
Champaign, IL 61820
Phone: (217) 352-9294
Email: lgeiler@meyercapel.com

**CERTIFICATE OF SERVICE BY ATTORNEY**

      In accordance with Fed.R.Civ.P. 5(a) and LR5.3(c) the undersigned attorney certifies that the foregoing **DEFENDANT'S FIRST MOTION IN LIMINE (Toni Burkhalter nka Toni Gist)** was filed with the Clerk of this Court by submission of the same via this Court's Electronic Case File System ("ECF") on January 18, 2023 and that notice of said electronic filing will automatically be transmitted by email to:

**David Brian Levin -** dlevin@toddflaw.com

**Steven Gene Perry -** sperry@toddflaw.com

      By:    **/s/ Lorna K. Geiler**
                    Lorna K. Geiler, Bar#6192940
                    Attorney for the Defendant
                    Meyer Capel, A Professional Corporation
                    306 W. Church St.
                    Champaign, IL 61820
                    Phone: (217) 352-1800
                    Email: lgeiler@meyercapel.com

2:18-cv-02307-SEM-EIL # 112    Page 6 of 16
2:18-cv-02307-SEM-EIL # 55-9    Page 1 of 5
E-FILED
Tuesday, 21 July, 2020  10:51:38 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| RYAN ROBB,<br><br>    Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 505 (PARKLAND COLLEGE) COUNTIES OF CHAMPAIGN, COLES, DEWITT, DOUGLAS, EDGAR, FORD, IROQUOIS, LIVINGSTON, MCLEAN, MOULTRIE, PIATT, VERMILION AND STATE OF ILLINOIS,<br><br>    Defendant. | Case No. 2:18-cv-02307-CSB-EIL<br><br>**DECLARATION OF TONI MARIE BURKHALTER** |

1.    My name is Toni Marie Burkhalter. I am over the age of 18 years and if called upon to testify in this case, I could competently testify as follows.

2.    I have been acquainted with the Plaintiff, Ryan Robb, since August 1996.

3.    Ryan Robb and I were faculty members together at Parkland College for approximately 14 years.

4.    I was originally hired at Parkland College as an anatomy and physiology instructor.

5.    I taught various courses at Parkland College from 2001-2017, including Biology 120, Fundamentals of Nutrition.

6.    From 2004-2017, I also served at the Course Coordinator for Biology 120 at Parkland College. My duties as the Course Coordinator included, but were not limited to, teaching



DEFENDANT'S EXHIBIT 1

several sections of Biology 120; mentoring adjunct faculty members; developing honors, online, and traditional curriculums for the course; developing PowerPoint and video lectures for the course; preparing exams, homework assignments, and in-class activities to assess student learning; and overseeing the instruction of approximately 300 students annually.

7. Since I left Parkland College in 2017, I have been a Senior Instructor at the University of Illinois at Urbana-Champaign ("UIUC") and I teach a course titled Food Science and Human Nutrition 120, Contemporary Nutrition. This is substantially the same as the Biology 120 course I taught at Parkland College.

8. Additionally, at UIUC, my duties include acting as an advisor for students in the Food Science and Human Nutrition Department. I also review the specifics of human nutrition courses students have completed at other colleges and universities, and determine whether they qualify for transfer credit at UIUC.

9. I earned a Master of Science degree in Animal Science from UIUC in 1999. This is the same degree Ryan Robb earned, from the same university, approximately two years later.

10. I have reviewed Ryan Robb's transcript from UIUC. His graduate level coursework at UIUC is similar to the courses I took while earning my master's degree in Animal Science there.

11. Many of the 300 and 400 level classes Ryan Robb completed during his graduate coursework at UIUC are now considered 400 and 500 level classes, respectively, at UIUC.

12. Several of the graduate level Animal Sciences ("ANSC") courses Ryan Robb completed are cross-listed with graduate level courses in Nutritional Sciences ("NUTR") and/or Food Science and Human Nutrition ("FSHN"). I believe Ryan Robb's extensive undergraduate coursework in Biology and Chemistry with the following 27 credits of graduate level coursework more than qualifies Ryan Robb to teach Biology 120 at Parkland College:

2

a.  ANSCI 403 TECH ANI NUTRN RSRCH (3 credits) is now titled ANSI 523 Techniques in Animal Nutrition (3 credits). This course is cross-listed as NUTR 523 (3 credits).

b.  ANSCI 340 APPLIED STAT METHODS (4 credits) is now titled ANSC 440 APPLIED STATISTICAL METHODS I (4 credits). This course is cross-listed as FSHN 440 (4 credits).

c.  ANSCI 490 ANIMAL SCI SEMINAR (2 credits) is now titled ANSC 590 Animal Sciences Seminar (2 credits). This course is cross-listed as NUTR 591 (2 credits).

d.  BIOCH 350 INTRO BIOCHEMISTRY (3 credits) is now titled MCB 450 Introductory Biochemistry (3 credits) and is a required course for the Nutritional Sciences and Food Science and Human Nutrition M.S. degrees.

e.  ANSCI 309 MEAT SCIENCE (4 credits) is now titled ANSC 409 Meat Science, Fundamental biological principles that influence composition, processing, preservation, and quality of meat and meat products. Course content is similar to FSHN 460 Food Processing (4 credits) and FSHN 461 Food Processing I (4 credits).

f.  ANSCI 493 RESEARCH STUDIES IN ANSCI (4 credits). Ryan Robb's thesis research focused on nutritional, metabolic and hormonal impacts on meat quality. Live animal ultrasound was utilized to predict quality in addition to USDA carcass grades, mechanical shear force values, cooking/sensory panels, etc. This work aligns with credit for FSHN 595

    Advanced Topics in Food Science (4 credits) and FSHN 598 Advanced Special Problems (up to 8 credits).

  g. ANSCI 312 ANIMAL GROWTH & DEVEL (3 credits) is now titled ANSC 452 Animal Growth and Development (4 graduate credit hours), Basic principles of animal growth from early fetal development through typical marketing ages for the major domestic animal species. Topics discussed include molecular and cellular determinants of tissue development and whole animal growth, with coverage of current and future technologies for manipulating growth to enhance animal production.

  h. ANSCI 320 NUT & DIG PHYS (3 credits) is no longer a part of the ANSC graduate degree because of the animal surgery component yet critical knowledge of nutrition and monogastric digestive physiology was gained from this graduate level course.

13. When I left Parkland College in 2017, I recommended Ryan Robb to my superiors to help replace me and teach some of the sections of Biology 120.

14. The individuals to whom I made this recommendation included my Department Head, Dr. Scott Siechen.

15. Based upon my understanding of Ryan Robb's background and his knowledge of the Biology 120 curriculum, I believe he was qualified to teach Biology 120 at Parkland College.

16. I also believe that Ryan Robb would not have needed to "team teach" Biology 120, as he was fully capable of teaching the course on his own.

4

17. I also believe that Ryan Robb would have been qualified to teach other non-agricultural courses at Parkland College, including some courses in anatomy and physiology, veterinary technology, food science, and microbiology.

18. The above is all the information I have to date regarding Ryan Robb, his academics, career at Parkland College, and our professional relationship. I am requesting not to be deposed by either side. If a deposition request is pushed forward, I can provide documentation from my doctors outlining any deposition hearing as a hardship. As I am currently undergoing long-term treatment for an aggressive cancer while trying to work full time and minimize stress. It would be a physical, emotional, and professional strain if I were asked to take time away from my treatment or my full time job to complete a deposition.

19. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2020

_____  05/20/2020
Toni Marie Burkhalter

5





# Assumed Practices

## Policy Changes Adopted on Second Reading

*The Board of Trustees adopted these policies on second reading at its meeting on June 26, 2015.*

### Background

Adjustments to the Criteria for Accreditation and Assumed Practices are considered by the Board annually, usually with first reading in February and second reading in June. These adjustments are based on comments received from institutions and peer reviewers when they find that certain Core Components and Assumed Practices require clarification or are subject to misinterpretation.

The proposed changes were circulated to the membership and other interested parties this spring. HLC received approximately 35 comments regarding the proposed changes to the Assumed Practices related to faculty qualifications. Most comments were supportive of the proposed revisions, but some raised concerns regarding the implementation timeline. HLC adjusted the implementation timeline to address these concerns. The Board considered the comments, including a proposal to grandfather existing faculty, in determining the final wording of the policy and the implementation schedule.

### Implementation

Because HLC's Board recognized that the implementation of certain aspects of the expectations regarding faculty qualifications may require a period of transition at some institutions, the Board is allowing institutions until September 1, 2017 to meet the faculty qualification expectations outlined in the revised Assumed Practice. The Board declined to adopt any grandfathering provisions as part of the final revised policy.

In setting the implementation date on September 1, 2017, the Board intends to give institutions additional time to conduct a review of the qualifications of its faculty body as a whole (including both full-time and part-time) and those of teachers in dual credit courses or programs and to take the necessary steps to meet the requirements.

After September 1, 2017, peer review teams will review faculty qualifications at the time of an institution's comprehensive evaluation or at other times if this issue becomes a matter of concern. Faculty qualifications are considered in relation to Criterion Three, Core Component 3.C (see subcomponents 3.C.1, 3.C.2 and 3.C.4), even if the revised Assumed Practice is not under review.

To ensure consistency with the final revised policy, HLC will publish a revised version of its guidelines: "Determining Qualified Faculty: Guidelines for Institutions and Peer Reviewers," no later than August 31, 2015. The revised guidelines will include more

© Higher Learning Commission       policycomments@hlcommission.org • hlcommission.org • 800-6



details for institutions and for peer review teams regarding HLC's expectations surrounding the implementation of this requirement after the September 1, 2017, effective date.

Each institution should contact its staff liaison with any questions.

### Key to Changes

Policy wording to be deleted or revised is shown as strikethrough (~~old wording~~); new policy language, whether through addition or revision, is shown in bold (**new wording**).

| Policy CRRT.B.10.020 | Assumed Practices |
|---|---|
|  | Foundational to the Criteria and Core Components is a set of practices shared by institutions of higher education in the United States. Unlike Criteria and Core Components, these Assumed Practices are (1) generally matters to be determined as facts, rather than matters requiring professional judgment and (2) unlikely to vary by institutional mission or context.<br><br>**A. Integrity: Ethical and Responsible Conduct**<br>1. The institution has a conflict of interest policy that ensures that the governing board and the senior administrative personnel act in the best interest of the institution.<br>2. The institution has ethics policies for faculty and staff regarding conflict of interest, nepotism, recruitment and admissions, financial aid, privacy of personal information, and contracting.<br>3. The institution provides its students, administrators, faculty, and staff with policies and procedures informing them of their rights and responsibilities within the institution.<br>4. The institution provides clear information regarding its procedures for receiving complaints and grievances from students and other constituencies, responds to them in a timely manner, and analyzes them to improve its processes.<br>5. The institution makes readily available to students and to the general public clear and complete information including:<br>   a. statements of mission, vision, and values<br>   b. full descriptions of the requirements for its programs, including all pre-requisite courses<br>   c. requirements for admission both to the institution and to particular programs or majors<br>   d. policies on acceptance of transfer credit, including how credit is applied to degree requirements. (Except for courses articulated through transfer policies or institutional agreements, the institution makes no promises to prospective students regarding the acceptance of credit awarded by examination, credit for prior learning, or credit for transfer until an evaluation has been conducted.)<br>   e. all student costs, including tuition, fees, training, and incidentals; its financial aid policies, practices, and requirements; and its policy on refunds<br>   f. policies regarding academic good standing, probation, and dismissal; residency or enrollment requirements (if any)<br>   g. a full list of its instructors and their academic credentials<br>   h. its relationship with any parent organization (corporation, hospital, or church, or other entity that owns the institution) and any external providers of its instruction. |

6. The institution assures that all data it makes public are accurate and complete, including those reporting on student achievement of learning and student persistence, retention, and completion.
7. The institution portrays clearly and accurately to the public its current status with the Higher Learning Commission and with specialized, national, and professional accreditation agencies.
    a. An institution offering programs that require specialized accreditation or recognition by a state licensing board or other entity in order for its students to be certified or to sit for the licensing examination in states where its students reside either has the appropriate accreditation and recognition or discloses publicly and clearly the consequences to the students of the lack thereof. The institution makes clear to students the distinction between regional and specialized or program accreditation and the relationships between licensure and the various types of accreditation.
    b. An institution offering programs eligible for specialized accreditation at multiple locations discloses the accreditation status and recognition of the program by state licensing boards at each location.
    c. An institution that provides a program that prepares students for a licensure, certification, or other qualifying examination publicly discloses its pass rate on that examination, unless such information is not available to the institution.
8. The governing board and its executive committee, if it has one, include some "public" members. Public members have no significant administrative position or any ownership interest in any of the following: the institution itself; a company that does substantial business with the institution; a company or organization with which the institution has a substantial partnership; a parent, ultimate parent, affiliate, or subsidiary corporation; an investment group or firm substantially involved with one of the above organizations. All publicly-elected members or members appointed by publicly-elected individuals or bodies (governors, elected legislative bodies) are public members.[1]
9. The governing board has the authority to approve the annual budget and to engage and dismiss the chief executive officer.[1]
10. The institution documents outsourcing of all services in written agreements, including agreements with parent or affiliated organizations.
11. The institution takes responsibility for the ethical and responsible behavior of its contractual partners in relation to actions taken on its behalf.

[1]*Institutions operating under federal control and authorized by Congress are exempt from these requirements. These institutions must have a public board that includes representation by individuals who do not have a current or previous employment or other relationship with the federal government or any military entity. This public board has a significant role in setting policy, reviewing the institution's finances, reviewing and approving major institutional priorities, and overseeing the academic programs of the institution.*

B. **Teaching and Learning: Quality, Resources, and Support**
   1. Programs, Courses, and Credits
       a. The institution conforms to commonly accepted minimum program length: 60 semester credits for associate's degrees, 120 semester credits for bachelor's degrees, and 30 semester credits beyond the bachelor's for master's degrees. Any variation from these minima must

      be explained and justified.
- b. The institution maintains structures or practices that ensure the coherence and quality of the programs for which it awards a degree. Typically institutions will require that at minimum 30 of the 120 credits earned for the bachelor's degree and 15 of the 60 credits for the associate's degree be credits earned at the institution itself, through arrangements with other accredited institutions, or through contractual relationships approved by the Commission. Any variation from the typical minima must be explained and justified.
- c. The institution's policy and practice assure that at least 50% of courses applied to a graduate program are courses designed for graduate work, rather than undergraduate courses credited toward a graduate degree. (Cf. Criterion 3.A.1 and 2.) (An institution may allow well-prepared advanced students to substitute its graduate courses for required or elective courses in an undergraduate degree program and then subsequently count those same courses as fulfilling graduate requirements in a related graduate program that the institution offers. In "4+1" or "2+3" programs, at least 50% of the credits allocated for the master's degree – usually 15 of 30 – must be for courses designed for graduate work.)
- d. The institution adheres to policies on student academic load per term that reflect reasonable expectations for successful learning and course completion.
- e. Courses that carry academic credit toward college-level credentials have content and rigor appropriate to higher education.
- f. The institution has a process for ensuring that all courses transferred and applied toward degree requirements demonstrate equivalence with its own courses required for that degree or are of equivalent rigor.
- g. The institution has a clear policy on the maximum allowable credit for prior learning as a reasonable proportion of the credits required to complete the student's program. Credit awarded for prior learning is documented, evaluated, and appropriate for the level of degree awarded. (Note that this requirement does not apply to courses transferred from other institutions.)
- h. The institution maintains a minimum requirement for general education for all of its undergraduate programs whether through a traditional practice of distributed curricula (15 semester credits for AAS degrees, 24 for AS or AA degrees, and 30 for bachelor's degrees) or through integrated, embedded, interdisciplinary, or other accepted models that demonstrate a minimum requirement equivalent to the distributed model. Any variation is explained and justified.

2. Faculty Roles and Qualifications
   - a. **Qualified faculty members are identified primarily by credentials, but other factors, including but not limited to equivalent experience, may be considered** ~~in addition to the degrees earned~~ **by the institution in determining whether a faculty member is qualified.** Instructors (excluding for this requirement teaching assistants enrolled in a graduate program and supervised by faculty) possess an academic degree relevant to what they are teaching and at least one level above the level at which they teach, except in programs for terminal degrees or when equivalent experience is established. In terminal degree programs, faculty members possess the same level of degree. When faculty members are employed based on equivalent

experience, the institution defines a minimum threshold of experience and an evaluation process that is used in the appointment process. **Faculty teaching general education courses, or other non-occupational courses** ~~that transfer,~~ ~~typically~~ **hold a master's degree or higher in the discipline or subfield. If a faculty member holds a master's degree or higher in a discipline or subfield other than that in which he or she is teaching, that faculty member should have completed a minimum of 18 graduate credit hours in the discipline or subfield in which they teach.**

   b. **Instructors teaching in graduate programs should hold the terminal degree determined by the discipline and have a record of research, scholarship or achievement appropriate for the graduate program.**

   ~~b~~c. Instructors teaching at the doctoral level have a record of recognized scholarship, creative endeavor, or achievement in practice commensurate with doctoral expectations.

   ~~c~~d. Faculty participate substantially in:
   a. oversight of the curriculum—its development and implementation, academic substance, currency, and relevance for internal and external constituencies;
   b. assurance of consistency in the level and quality of instruction and in the expectations of student performance;
   c. establishment of the academic qualifications for instructional personnel;
   d. analysis of data and appropriate action on assessment of student learning and program completion.

3. Support Services
   a. Financial aid advising clearly and comprehensively reviews students' eligibility for financial assistance and assists students in a full understanding of their debt and its consequences.
   b. The institution maintains timely and accurate transcript and records services.

C. **Teaching and Learning: Evaluation and Improvement**
1. Instructors (excluding for this requirement teaching assistants enrolled in a graduate program and supervised by faculty) have the authority for the assignment of grades. (This requirement allows for collective responsibility, as when a faculty committee has the authority to override a grade on appeal.)
2. The institution refrains from the transcription of credit from other institutions or providers that it will not apply to its own programs.
3. The institution has formal and current written agreements for managing any internships and clinical placements included in its programs.
4. A predominantly or solely single-purpose institution in fields that require licensure for practice is also accredited by or is actively in the process of applying to a recognized specialized accrediting agency for each field, if such agency exists.
5. Instructors communicate course requirements to students in writing and in a timely manner.
6. Institutional data on assessment of student learning are accurate and address the full range of students who enroll.
7. Institutional data on student retention, persistence, and completion are accurate and address the

full range of students who enroll.

### D. Resources, Planning, and Institutional Effectiveness

1. The institution is able to meet its current financial obligations.
2. The institution has a prepared budget for the current year and the capacity to compare it with budgets and actual results of previous years.
3. The institution has future financial projections addressing its long-term financial sustainability.
4. The institution maintains effective systems for collecting, analyzing, and using institutional information.
5. The institution undergoes an external audit by a certified public accountant or a public audit agency that reports financial statements on the institution separately from any other related entity or parent corporation. For private institutions the audit is annual; for public institutions it is at least every two years.[2]
6. The institution's administrative structure includes a chief executive officer, chief financial officer, and chief academic officer (titles may vary) with appropriate credentials and experience and sufficient focus on the institution to ensure appropriate leadership and oversight. (An institution may outsource its financial functions but must have the capacity to assure the effectiveness of that arrangement.)

[2]*Institutions under federal control are exempted provided that they have other reliable information to document the institution's fiscal resources and management.*

---

*Policy Number Key*
*Section CRRT: Criteria and Requirements*
*Chapter B: Criteria for Accreditation*
*Part 10: General*

---

*Last Revised: June 2015*
*First Adopted: February 2012*
*Revision History: February 2012, June 2013, June 2014, June 2015*